IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES ROE and RUSSELL HEDLUND, individually and on behalf of all others similarly situated, | No. 3:22-cv-00086 |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | DEMAND FOR JURY TRIAL |
| AGILIS ENGINEERING, INC., BELCAN ENGINEERING GROUP, LLC, CYIENT, INC., PARAMETRIC SOLUTIONS, INC., QUEST GLOBAL SERVICES-NA, INC., and RAYTHEON TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION, | |
| Defendants. | |

Plaintiff James Roe ("Plaintiff Roe") and Plaintiff Russell Hedlund ("Plaintiff Hedlund") (collectively, "Plaintiffs"), individually and on behalf of all similarly situated individuals, complain upon knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters, seeking damages and injunctive relief against QuEST Global Services-NA, Inc. ("QuEST"), Belcan Engineering Group, LLC ("Belcan"), Cyient, Inc. ("Cyient"), Agilis Engineering, Inc. ("Agilis"), and Parametric Solutions, Inc. ("PSI") (collectively the "Supplier Defendants") and Raytheon Technologies Corporation ("Raytheon"), Pratt & Whitney Division ("P&W") (together with the Supplier Defendants, "Defendants") under the antitrust laws of the United States.

## I.    INTRODUCTION

1.    This action arises out of an illegal conspiracy to restrain competition in the labor market and reduce compensation for engineers and other skilled laborers beginning in 2011 and continuing through at least 2019.

2.    P&W is one of the largest aerospace engine design, manufacture, and service companies the United States, employing over 36,000 people, including thousands of engineers and skilled workers.  When demand dictates, Supplier Defendants provide P&W with additional Engineers to work alongside P&W employees on P&W projects.

3.    On December 10, 2021, the U.S. Department of Justice ("DOJ") announced a criminal indictment against Defendant Mahesh Patel, a Manager and Director at P&W that supervised and managed P&W's relationship with Supplier Defendants. *See* Affidavit in Support of Criminal Complaint and Arrest Warrant, *United States v. Patel*, No. 3:21-mj-01189-RAR-1 (D. Conn. filed Dec. 9, 2021) ("Patel Affidavit"). On December 15, 2021, the DOJ unsealed a grand jury indictment against Patel and five additional co-conspirator individuals: Robert Harvey, Harpreet Wasan, Steven Houghtaling, Tom Edwards, and Gary Prus. See Indictment, *United States v. Patel*, No. 3:21-cr-00220-VAB (D. Conn. filed Dec. 15, 2021), Dkt. 20 ("DOJ Indictment").

4.    The indictments publicly revealed "a prolonged and widespread scheme to deprive aerospace workers of the ability to plan their own careers and earn competitive pay."[1] Specifically, the Patel Affidavit and DOJ Indictment allege that, from 2011 through 2019, P&W and the Supplier Defendants entered into a series of agreements with each other through which they

---

[1] *See Six Aerospace Executives and Managers Indicted for Leading Roles in Labor Market Conspiracy that Limited Workers' Mobility and Career Prospects*, U.S. DEPT. OF JUSTICE (Dec. 16, 2021), https://www.justice.gov/usao-ct/pr/six-aerospace-executives-and-managers-indicted-leading-roles-labor-market-conspiracy-1 (accessed Jan. 6, 2022).

conspired to retrain competition in the aerospace engineering market by agreeing not to hire Engineers employed by (or working as an independent contractor for) co-conspirator Supplier Defendants (the "No-Poach Agreement") for P&W projects P&W projects and statements of work in the United States and its territories.

5.     Defendants were motivated to enter into the No-Poach Agreement because it would reduce their labor costs and thus increase their profits. For example, in one communication between Defendants, it was argued that adhering to the No-Poach Agreement was essential to "pre[v]ent poaching and price war." Patel Affidavit ¶ 24; DOJ Indictment ¶ 27(b).

6.     To that end, the No-Poach Agreement intentionally and successfully reduced competition in the market by curtailing career advancement opportunities for Engineers and suppressing the prevailing market rate compensation received by Engineers.

7.      The agreement was monitored and enforcement by Defendants' senior management. Typically, Supplier Defendants that perceived rule breaking by co-conspirator Supplier Defendants reported the actions to P&W's Patel, who in turn sought to reinforce the terms the terms of the No-Poach Agreement.

8.     Defendants' ignored concerns raised by their own managers and executives that restricting the hiring of employees as required by the No-Poach Agreement was illegal and persisted in the conduct.

9.     Defendants' conspiracy thus restricted trade and is *per se* unlawful under federal law. Plaintiffs seek injunctive relief and damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, respectively, and pursuant to 28 U.S.C. § 1331 and 1337.

11.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b). During the Class Period each Defendant resided, transacted business, was found, or had agents in this District; a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

12.     This Court has personal jurisdiction over each Defendant. As alleged below, a substantial part of the events giving rise to Plaintiff's claims occurred in this District and the United States. Defendants conspired in this District to restrain competition and suppress compensation of employees located in this District and throughout the United States.

## III.     THE PARTIES

13.     Plaintiff Roe was and is a citizen and resident of Connecticut during the Class Period. Plaintiff Roe is a current P&W employee engineer who was employed by QuEST as an engineer prior to being hired by P&W during the Class Period (as defined below). Plaintiff Roe was injured in his business or property by reason of the violation alleged herein.

14.     Plaintiff Hedlund was and is a citizen and resident of Connecticut. Plaintiff Hedlund was employed by Defendant Belcan during Class Period, including 2017 through part of 2020. Plaintiff Hedlund was injured in his business or property by reason of the violation alleged herein

15.     On information and belief, Defendant P&W is identified as Company A in the Patel Affidavit and the Indictment. *See* Patel Affidavit ¶ 5; DOJ Indictment ¶ 2. P&W is a division of Raytheon and is one of the largest aerospace engine design, manufacture, and service companies

in the United States. P&W is a Delaware corporation with its corporate headquarters in East Hartford, Connecticut. P&W has over 36,000 employees, including thousands of Engineers. P&W relies upon different sources of labor to design, manufacture, and service its aerospace products, including by hiring Engineers directly and through outsource engineering. In an outsource arrangement, an outsource engineering supply company enters into an agreement with P&W to complete a particular project, assigns Engineers from among its own employees to complete that project, and receives an agreed-upon payment from P&W for such work. P&W, thus, competes with the Supplier Defendants to recruit and hire Engineers, while also outsourcing Engineers from the Supplier Defendants.

16.     On information and belief, Defendant QuEST is identified as Company B in the Patel Affidavit and the Indictment. *See* Patel Affidavit ¶ 6(a); DOJ Indictment ¶ 5. QuEST is an Ohio corporation with a principal place of business in East Hartford, Connecticut. QuEST supplies Engineers who worked on projects for P&W and other aerospace firms on an outsource basis. QuEST competes with P&W as well as the other Supplier Defendants to recruit and hire Engineers. QuEST also competes with other Supplier Defendants for outsource work from P&W and does so on the basis of, among other things, price.

17.     On information and belief, Defendant Belcan is identified as Company C in the Patel Affidavit. *See* Patel Affidavit ¶ 6(b); DOJ Indictment ¶ 6. Belcan is an Ohio corporation with a principal place of business in Windsor, Connecticut. Belcan supplies Engineers who work on projects for P&W on an outsource basis. Belcan competes with P&W as well as the other Supplier Defendants to recruit and hire Engineers. Belcan also competes with other Supplier Defendants for outsource work from P&W and does so on the basis of, among other things, price.

18.     On information and belief, Defendant Cyient is identified as Company D in the Patel Affidavit and the Indictment. *See* Patel Affidavit ¶ 6(c); DOJ Indictment ¶ 7. Cyient, formerly known as Infotech Enterprises Limited, is a California corporation with a principal place of business in East Hartford, Connecticut. Cyient supplies Engineers who worked on projects for P&W on an outsource basis. Cyient competes with P&W as well as the other Supplier Defendants to recruit and hire Engineers. Cyient also competes with other Supplier Defendants for outsource work from P&W and does so on the basis of, among other things, price.

19.     On information and belief, Defendant PSI is identified as Company E in the Patel Affidavit and the Indictment. *See* Patel Affidavit ¶ 6(d); DOJ Indictment ¶ 8. PSI is a Florida corporation with offices in Jupiter, Florida. PSI supplies Engineers who worked on projects for P&W on an outsource basis. PSI competes with P&W as well as the other Supplier Defendants to recruit and hire Engineers. PSI also competes with other Supplier Defendants for outsource work from P&W and does so on the basis of, among other things, price.

20.     On information and belief, Defendant Agilis is identified as Company F in the Patel Affidavit and the Indictment. *See* Patel Affidavit ¶ 6(e); DOJ Indictment ¶ 9. Agilis is a Florida corporation with a principal place of business in Palm Beach Gardens, Florida. Agilis supplies Engineers who worked on projects for P&W on an outsource basis. Agilis competes with P&W as well as the other Supplier Defendants to recruit and hire Engineers. Agilis also competes with other Supplier Defendants for outsource work from P&W and does so on the basis of, among other things, price.

21.     During the Class Period (defined Below), Defendants employed members of the proposed Class in Vermont, Massachusetts, Illinois, Ohio, Georgia, Florida, Puerto Rico, Kentucky, and throughout the United States, including in this District (Connecticut).

22.     Defendants' actions described herein are part of, and in furtherance of, the unlawful conduct alleged. These actions were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with Defendants' actual and/or apparent authority.

23.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance of the No-Poach Agreement and other anticompetitive conduct.

24.     References to any act, deed, or transaction of any corporation or limited liability entity, the allegation mean the corporation or limited liability entity acted by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, or of the corporation's or limited liability entity's business.

## IV.    FACTUAL ALLEGATIONS

### A.    NO-POACH AGREEMENTS ARE ANTICOMPETITIVE

25.    As used herein, the term "No-Poach Agreement" refers to an agreement between two or more companies or employers not to hire or recruit (or "poach") one another's employees or an agreement to restrict the compensation offered to employees.[2] These agreements can be recast as agreements between two companies not to compete for employees. No-Poach Agreements therefore have the effect of restraining competition in labor markets by depriving individuals of "job opportunities, information, and the ability to use competing offers to negotiate better terms of employment."[3]

26.    In *Antitrust Guidance for Human Resource Professionals* the DOJ and Federal Trade Commission ("FTC") argue, *inter alia*, that "firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services" and that it is "unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs."[4] Thus, the DOJ and FTC argue, agreements between companies not to recruit employees or not to compete on terms of compensation are illegal.[5]

---

[2] *No-Poach Approach*, U.S. DEPT. OF JUSTICE (Sept. 30, 2019), https://www.justice.gov/atr/division-operations/division-update-spring-2019/no-poach-approach. The term "No-Poach" was initially used only to the describe an agreement not to cold call competitors' employees. *See, e.g.* Complaint, *U.S. v. Adobe Systems, Inc., et al.* No. 1:10-cv-01629 (D.D.C.), ¶ 2 ("These **no cold call agreements** are facially anticompetitive...") (emphasis added). More recently, however, the term has come to be used more comprehensively to cover all types of agreements restricting the movement of employees between employers.

[3] *Id.*

[4] *Antitrust Guidance for Human Resource* Professional, DEPT. OF JUSTICE ANTITRUST DIV. & FEDERAL TRADE COMM. (Oct. 2016), https://www.justice.gov/atr/file/903511/download (accessed Jan. 6, 2022).

[5] *Id.* at 2-3.

27.    No-Poach Agreements that are "separate from or not reasonably necessary to a larger legitimate collaboration between [employers]" are considered "naked" No-Poach Agreements and are *per se* illegal. "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws."[6]

## B.    THE UNITED STATES AEROSPACE ENGINEERING MARKET

28.    Aerospace engineers primarily design aircraft, spacecraft, satellites, and missiles and thus are typically employed by large contractors such as P&W that manufacture these machines and devices.

29.    There were approximately 60,000 aerospace engineers employed in 2020, and about 4,000 openings for aerospace engineers are projected each year, on average, over the decade.

30.    Companies like P&W directly employ thousands of Engineers to work on various aspects of the design and manufacture of aircraft or aircraft components (*e.g.* engines), spacecraft, satellites, and missiles. However, in addition to directly employing thousands of Engineers, companies like P&W also contract with outsourcing labor supply companies such as Supplier Defendants to provide additional Engineers and skilled workers for projects.

31.    In this role, Supplier Defendants enter agreements with firms like P&W to complete, or to assist in completing, a particular project, often referred to as a Statement of Work and then provide Engineers and other skilled workers to work on those projects. Supplier Defendants assign their own Engineer employees to the project, and Supplier Defendants collect an agreed-upon payment from purchaser firms such as P&W.

---

[6] *Id.*

32.    Because of this dynamic, Supplier Defendants, having bid a specific price for a project, have incentive to keep labor costs down to maintain profit levels.

33.    In this labor market for aerospace engineering services, firms such as P&W and Supplier Defendants are buyers, and Engineers, including Plaintiffs and the members of the Class, are sellers.

34.    In short, Defendants pay compensation to Engineers for the Engineers' services and compete with one another to recruit and hire Engineers.

35.    In a properly functioning market, Supplier Defendants would compete with one another for outsource work projects from firms such as P&W. One element of this competition is the price quoted to complete a project. Because labor costs impact the price a supplier can offer, labor costs for the Engineers employed by suppliers constitute one of the largest parts of the ultimate price that is quoted to firms such as P&W.

36.    Engineers have highly specialized skills. Engineers graduate from undergraduate and/or graduate engineering programs with engineering degrees—often specific to aerospace engineering. Once in the workforce, Engineers further specialize based on the work they do, including specializing in a category (*e.g.*, software/systems engineers, mechanical engineers, structural analysts), and within those categories, specific to particular functions (*e.g.*, specializing in aerodynamic fluid flow; structural design; guidance, navigation and control; instrumentation and communication; and propulsion and combustion). The aerospace application of these categories and functions is particular to aerospace engineering services and not directly transferable to other engineering fields.

37.    Because of the significant training and experience required to perform aerospace engineering services, Engineers would not turn to other engineering employment opportunities if

a hypothetical monopsonist imposed a small but significant non-transitory decrease in compensation.

38.     Furthermore, as set forth herein, as Engineers become further specialized, their skills both increase in value due to the scarcity of experienced aerospace engineers in each specialty, and increase in particular value to firms working on projects that Engineers' specializations are focused on.

39.     The relevant geographic market for the relevant market is the United States and its territories.

40.     Engineers in the United States and its territories do not see aerospace engineering jobs abroad as a reasonable substitute for aerospace engineering jobs in the United States and its territories. Such foreign positions are less desirable for numerous reasons, including, without limitation, language barriers, visa requirements, significant costs associated with moving abroad, and the significant distances such moves would create between the Engineers and family members. Although foreign Engineers have immigrated to the United States to participate in the relevant market, on information and belief, Engineers in the United States do not frequently take aerospace engineering positions outside of the United States.

**C.     DYNAMICS OF A COMPETITVE LABOR MARKET**

41.     In a properly functioning and lawfully competitive labor market, Defendants would aggressively compete for Engineers by recruiting and hiring from each other. Because experienced Engineers are critical to Defendants' ability to compete for and complete projects, in the absence of the No-Poach Agreement, Defendants would compete with each other for the services of skilled Engineers.

42.     Active lateral recruiting is important in properly functioning labor markets, in part because companies value satisfied employees who are good at their jobs, leading them to perceive

a rival company's current employees as more qualified, harder working, and more stable than candidates who are unemployed or actively seeking employment outside their current jobs. Thus, a company seeking to hire a new employee will lessen the risks associated with that hire by seeking to hire a rival's employee.

43.     Competition for Engineers via recruiting and lateral hiring has a significant impact on Engineers' mobility and compensation in several ways.

44.     First, when companies employing Engineers become aware of attractive outside opportunities for their Engineers, the threat of losing these employees to a competitor encourages an employer to preemptively increase compensation to increase morale and competitive positioning and ultimately to retain valuable labor. If certain employers do not react to competition, their Engineers may be receptive to recruiting by a rival employer or seek positions that offer more generous compensation and benefits elsewhere.

45.     Once an Engineer has received an offer from a rival employer, retaining that employee may require a disruptive increase in compensation for one individual. Increasing compensation for one person will have more widespread salary effects across a company and market. One such mechanism for this widespread effect is salary discovery, in which information about competing salaries causes higher compensation, even among those employees not actively looking to switch employers. Another such mechanism is "internal equity" within organizations, where employers endeavor to maintain parity in pay levels across employees within the same categories, as well as maintain certain compensation relationships among employees across different job categories.

46.     Normally, Defendants would be incentivized to preempt lateral departures by paying their Engineers high enough compensation to dissuade them from seeking employment

elsewhere for higher pay. Preemptive retention measures would therefore have led to increased compensation for all Engineers.

47.    Additionally, the availability of desirable positions at competing employers forces employers to increase compensation to retain Engineers who are likely to join a competitor. This can occur both when a particular Engineer or group of Engineers becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its Engineers by increasing compensation levels. In the former scenario, even a targeted increase designed to retain specific Engineers will put upward pressure on the entire organization's compensation structure.

48.    The positive compensation effects of hiring Engineers from competitors are not limited to the particular individuals who seek new employment or to the particular individuals who would have pursued new positions but for a no-poach agreement. Instead, the effects of a restraint in the labor market as a result of a no-poach agreement (and the effects of suppressing recruiting and hiring pursuant to a no-poach agreement) commonly impact all individuals in positions subject to the restraint.

49.    Conversely, suppression of competition for cross-hiring and recruitment serves as a drag on compensation that permeates throughout an organization. Here, the No-Poach Agreement enabled Defendants to target the impact of their coordination on the employees most likely to command disruptive increases that, through processes of internal equity and salary discovery, would have led to increases that would have benefited all their employees.

50.    Thus, while Defendants obtain significant advantages by engaging in lateral hiring among them, the competition also inflicts a cost on the other Defendants by taking away valuable employees and raising pay for Engineers across the Defendants. Consequently, by agreeing not to

compete, Defendants were able to minimize these costs to the detriment of Plaintiffs and members of the proposed Class.

### D.    AEROSPACE ENGINEERING MARKET STRUCTURE

51.    In addition to the direct evidence of the No-Poach Agreement described above, the market for aerospace Engineers is characterized by plus factors that render the industry conducive to collusion, supporting the plausibility of the No-Poach Agreement. These "plus factors" include (1) numerous opportunities to collude; (2) high entry barriers for Aerospace Firms and Suppliers; (3) high exit barriers for Engineers; and (4) inelastic demand for and a lack of substitutes for aerospace Engineers.

52.    First, as stated above, the structure of the aerospace engineer labor market provided numerous opportunities for Defendants to collude. P&W worked hand-in-hand with Supplier Defendants to ensure P&W's projects were adequately staffed and that their costs were in line with their expectations. This level of collaboration led to long-lasting relationships between P&W and Supplier Defendants and regularly provided opportunities for collusion, with P&W executives like Patel visited Supplier Defendants' offices regularly.

53.    To further bolster relations, P&W issued awards to its most valued Suppliers for accomplishments in areas such as innovation and productivity. Supplier Defendants were frequent recipients of these awards, and P&W's Patel was often directly involved in their presentation.

54.    For example, in 2017, Belcan received the P&W Supplier Productivity Innovation Award. Belcan issued a press release in connection with this award, noting that this was the sixth award that Belcan received from P&W since 2010 and that the award was a testament to Belcan's highly valued contributions to P&W's success and the two companies' "enduring relationship." Patel spoke at the award ceremony and lauded "Belcan's commitment to driving change and

continuously delivering better solutions to [P&W] through value added innovations . . . while allowing [P&W] to maintain its competitive edge in the marketplace."

55.     In 2019, P&W awarded Cyient with two Supplier awards: the Supplier Innovation Award (for the seventh consecutive year) and the Supplier Highest Productivity Award (for the fourth consecutive year). Cyient issued a press release announcing these awards and noted that they "recognized Cyient's continued commitment to delivering unparalleled productivity and cost savings" including "multi-million dollars in cost savings that were realized through several supplier saving proposals."

56.     Second, the market for aerospace Engineers is characterized by high entry barriers for employers. For aerospace firms such as P&W to compete, they must develop desirable and proprietary products and technologies that commercial and governmental entities are willing to purchase. Without those products, aerospace firms such as P&W have no need for Engineers' labor. Without their own products, labor suppliers like Suppliers Defendants make up the rest of the market for purchasing Engineers' services. Labor suppliers likewise have high entry barriers, including, without limitation difficulties in establishing industry trust (of aerospace companies) and recognition, as well as difficulties in recruiting and retaining Engineers with requisite expertise.

57.     Third, there are high exit barriers for Engineers. Market entry requires that Engineers make substantial investments of time and money in their education, training, and experience to obtain the highly specialized skills necessary to perform this work. Engineers graduate from undergraduate and/or graduate engineering programs with engineering degrees—often specific to aerospace engineering. Once in the workforce, Engineers further specialize based on the work they do, including specializing in a category (e.g., software/systems engineers,

mechanical engineers, structural analysts), and within those categories, specific to particular functions (*e.g.*, specializing in aerodynamic fluid flow; structural design; guidance, navigation and control; instrumentation and communication; propulsion and combustion). The aerospace application of these categories and functions is particular to aerospace engineering services and not directly transferable to other engineering fields.

58.     Fourth*,* demand for Engineers is relatively inelastic. Over the past decade, about 4,000 openings for Engineers have been projected each year. As described above, because Engineers have obtained highly specialized skills that are required to perform work in the industry, their services generally cannot be substituted by engineers from different industries.

### E.     DEFENDANTS HAD THE ABILITY TO RESTRAIN COMPETITION

59.     Defendants had the ability, collectively, to suppress compensation to Engineers. That is, Defendants can impose a small but significant decrease in pay or compensation without losing sufficient numbers of Engineers to defeat the effects of the pay decrease. Likewise, Defendants can maintain pay below a competitive level without losing sufficient numbers of Engineers to defeat the effects of the pay decrease.

60.     Defendants' demonstrated ability to profitably suppress compensation is evidence of Defendants' collective market power in the relevant market described above.

### F.     DEFENDANTS COLLECTIVELY ENTERED INTO A NO-POACH AGREEMENT THAT RESTRAINED COMPETITION

61.     As early as 2011 and continuing until at least as late as September 2019, Supplier Defendants agreed with each other to restrict the hiring and recruiting of Engineers between and among them in the United States.

62.     The No-Poach Agreement is evidenced by, *inter alia,* communications below between Supplier Defendants in which they reference a series of agreements between themselves

not to hire each other's employees. This series of agreements and restrictions had the common purpose of limiting competition for, and thereby restricting the free movement of Engineers within the aerospace engineering industry. Because Engineers' ability to move between Supplier Defendants was artificially restricted, the No-Poach Agreement artificially extended Engineers' length of work at Supplier Defendants and reduced or eliminated their ability to advocate and obtain better terms of employment, including compensation, at current and future employers.

63.     The hiring and recruiting restrictions that make up the No-Poach Agreement were shaped by Defendants' shared financial motivations, specifically a desire to suppress wages and thereby lessen labor costs.

64.     The No-Poach Agreement was monitored and enforced by P&W's Mahesh Patel, who was a P&W manager and later director of the P&W unit that managed relationships with Supplier Defendants.

65.     Evidence that establishes the existence of the No-Poach Agreement is provided below.

## 1.     DEFENDANTS RESTRICTED HIRING AND RECRUITING BETWEEN SUPPLIER DEFENDANTS

66.     Through P&W's Patel, Supplier Defendants agreed with each other not to hire Engineers away from each other. As stated, Beginning as early as 2011, certain Supplier Defendants who provided Engineers to P&W entered into agreements that they would restrict the hiring and recruiting of Engineers between and among them.

67.     P&W's involvement in this anticompetitive scheme began at around or about the same time, with Patel taking an active role in the conspiracy.

17

68.     P&W's Patel instructed managers and executives at Supplier Defendants that they should not be recruiting and hiring one another's Engineers.

69.     Supplier Defendants understood that these restrictions applied mutually among the Supplier Defendants themselves.

70.     Patel made these communications with each of the Suppliers directly, communicating the restriction and that other Suppliers were observing it as well.

71.     For example, in 2016, Patel emailed Gary Prus, the Chief Operating Officer, Executive Vice President and part owner of PSI. He stated: "Last time we talked you assured me that you will not hire any [P&W] partners employee [sic]. This must stop, otherwise others will also start poaching your employees." Patel Affidavit ¶ 29; DOJ Indictment ¶ 25(b).

72.     Patel also discussed these restrictions on Suppliers' recruiting and hiring when multiple Suppliers were present.

73.     For example, in December 2015, P&W hosted a dinner that was attended by Patel and representatives from Suppliers for P&W, including QuEST, Belcan, and Cyient. These representatives included individuals at senior levels of these companies, such as Tom Edwards, the President of the North America Operations for Cyient, and Harpreet Wasan, the Vice President/Strategic Client Partner for QuEST. Patel addressed the Supplier Defendant representatives at the dinner, during which he instructed the attendees that there should be no poaching of one another's Engineers. Patel Affidavit ¶ 20; DOJ Indictment ¶ 22(a).

74.     These instructions were subsequently shared with others at the Supplier Defendants. For example, one individual present at the December 2015 dinner later sent a summary of Patel's remarks, including the exhortation to follow the No-Poach Agreement, to Steven Houghtaling, a General Manager and Vice President of Belcan. *Id.*

75.     Suppliers also communicated directly with one another to confirm their agreement with and mutual adherence to the restrictions on recruiting and hiring.

76.     For example, in a September 2019 email exchange, after Agilis had hired four Cyient employees, Tom Edwards, the President for Cyient's North America Operations, reached out to the Founder, President, and CEO of Agilis, and asked him to stop "actively recruiting" Cyient's employees. *See* Patel Affidavit ¶ 34; DOJ Indictment ¶ 27(a). Agilis' CEO agreed, telling Cyient's President of North America Operations that Agilis' "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get [sic] unstable, and our margins all get hurt." *Id.* In response, Cyient's head of North America Operations thanked Agilis' CEO and noted, "I flat out ask our teams not to hire people from the other [P&W] suppliers." *Id.*

## 2.     DEFENDANTS HAD A COMMON FINANCIAL INTEREST IN SUPPRESSING LABOR COSTS

77.     Defendants shared a common interest in adhering to the No-Poach Agreement: it reduced Defendants' labor costs and increased profits.

78.     For example, in January 2017, Patel emailed a PSI executive (copying PSI's COO) after PSI had offered employment to a Cyient employee and stated: "Please do not hire any partners [sic] employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war." Patel Affidavit ¶ 24; DOJ Indictment ¶ 27(b).

79.     In March of 2016, while discussing P&W's hiring restrictions with an executive from another Supplier, Prus noted that, "Mahesh says he does not want the salaries to increase." Patel Affidavit ¶ 24.

80.     Likewise, in April of 2017, a General Manager from QuEST sent an email to P&W's Mahesh Patel and Quest's Harpreet Wasan complaining that Cyient had hired an Engineer who was employed with QuEST, noting that "[t]his is against our agreements with our employees

and against our known expectations of [P&W] for the cooperation of the outsource companies"
and complaining that if such hiring does not stop, it will "drive the price structure up." Patel
Affidavit ¶ 25; DOJ Indictment ¶ 27(c). Patel subsequently reached out to the executives of the
two Suppliers involved – the General Manager from QuEST and Tom Edwards, the President of
North America Operations from Cyient – and marked them as "required" attendees on an invitation
for a "private discussion" in his office the next day. Patel Affidavit ¶ 25.

### 3.    P&W POLICED AND ENFORCED THE NO-POACH AGREEMENT ON BEHALF OF DEFENDANTS

81.    P&W, through Patel, repeatedly acted as an intermediary between Supplier
Defendants to police the agreement restricting their recruiting and hiring, including by directly
reprimanding Supplier Defendants that solicited, hired, or attempted to hire other Defendant
Suppliers' employees.

82.    Patel often acted in response to requests from Supplier Defendants, who would alert
Patel to infractions of the No-Poach Agreement and ask that he assist in preventing or deterring
such violations.

83.    As an example, in May 2016, Steven Houghtaling, a Vice President for Belcan, was
informed by a colleague that "[a]nother employee" had been hired by PSI to work on an
outsourcing project for a company other than P&W. Patel Affidavit ¶ 27; DOJ Indictment ¶ 22(c).
The colleague asked Houghtaling if he "ever discuss[ed] the last one with Mahesh." *Id.*
Houghtaling assured the colleague that he had spoken to Patel and that Patel "said he'd talk to
[PSI] about it." *Id.* Houghtaling subsequently emailed Patel to complain that his company was
"losing another employee to [PSI]," and named the employee. *Id.*

84.    A few months later, a similar communication occurred in the opposite direction. In
November 2016, Gary Prus, PSI's Chief Operating Officer, Executive Vice President and part

owner, wrote an email to Patel complaining about Belcan "actively Recruiting [PSI] employees." Patel Affidavit ¶ 27; DOJ Indictment ¶ 22(d). Patel forwarded that email to Houghtaling, Belcan's Vice President, and another manager from the company, saying, "[w]e must not poach each other [sic] partners [sic] employee [sic]. Please communicate to [Belcan] HR not to interview or hire active employees working on [P&W] work." *Id.*

85.     Further, in January 2017, a representative from Cyient emailed Patel to inform him that PSI was "stealing our people" and had hired a Cyient Engineer. Patel forwarded this email to Prus, the COO, Executive Vice President and part owner of PSI and wrote, "Last time we talked you assured me that you will not hire any [P&W] partners [sic] employee [sic]. This must stop, otherwise others will also start poaching your employees. Please advise." Patel Affidavit ¶ 29; DOJ Indictment ¶ 25(b).

86.     Patel's enforcement of the agreement on behalf of the Suppliers was effective in ensuring that the Suppliers adhered to the terms of the agreement.

87.     For example, after a Belcan executive notified Patel that PSI was recruiting and hiring Engineers in violation of the agreement, Patel sent an email to Gary Prus, PSI's COO, Executive Vice President and part owner. Referencing Belcan, Patel wrote: "<u>You had assured me</u> that [PSI] will never soliciting [sic] [P&W's] long term partners [sic] employees . . . Please send me in writing that proper steps has [sic] taken place to curtail this practice." Patel Affidavit ¶ 31; DOJ Indictment ¶ 28(e) (emphasis in original). In a later email, Prus indicated that he understood Belcan was the source of this complaint, writing that Belcan "is making a big stink right now over any solicitations." Patel Affidavit ¶ 31. Prus subsequently instructed another PSI employee to "[p]lease stop speaking to any [Belcan] or other [P&W] supplier companies about transitioning to [a PSI] Office immediately." Patel Affidavit ¶ 31; DOJ Indictment ¶ 28(e).

88.     P&W also exercised its authority as a customer of the Suppliers in order to ensure they followed the prohibition from recruiting and hiring one another's Engineers.

89.     As an example, in June 2018, Patel reached out to executives from Belcan concerning a recent effort to hire an Engineer at QuEST. Patel had learned of these plans from individuals at QuEST. A recruiter at Belcan explained in an internal email, eventually forwarded to Belcan managers and executives, that QuEST "complained to [P&W] that we are 'stealing' their people, and [P&W] threatened to pull all POs from [Belcan] if we hire him." Patel Affidavit ¶ 33. A day later, a Belcan employee emailed Patel and said: "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" the Engineer at issue. *Id.*

### 4.     DEFENDANTS KNEW THE NO-POACH AGREEMENT WAS UNLAWFUL, YET PERSISTED WITH THEIR CONDUCT

90.     At least as early as January 2016, well before several of the examples of unlawful conduct described herein, certain managers and executives at Belcan began raising concerns with Patel that the conduct of P&W and the Suppliers was unlawful, specifically because they violated the antitrust laws.

91.     Early in January 2016, a Belcan General Manager received an email describing a civil lawsuit in which several major companies were accused of (as the Belcan employee forwarding the email put it) "engaging in illegal anti-poaching agreements……the companies involved had promised each other not to actively recruit employees from one another." *Id.* ¶ 35. The General Manager subsequently planned a meeting with Patel in which one of the items for discussion was "[i]nformal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal" (an apparent reference to the 2015 settlement in *In re High-Tech Employee Antitrust Litigation*, No. 5:11-cv-2509 (N.D. Cal.)). *Id.* ¶ 36.

92.     The same General Manager raised the unlawful nature of the restrictions on recruiting and hiring with Patel again in February 2017. In a series of emails, Belcan's Human Resources Director and the General Manager discussed an upcoming call with Patel, which was planned concerning a recent allegation that Belcan had hired an Engineer from QuEST in violation of the No-Poach Agreement. The HR Director noted her concern that "there is an anti-trust issue by us turning people away solely based on their previous employer." *Id.* ¶ 37. The General Manager acknowledged these concerns about illegality in a subsequent email to the HR Director, noting, "[P&W] (Mahesh Patel) is asking (insisting) that we not interview anyone currently employed by our competitors . . . I'm not sure if this is legal, but that is what they are requesting we do." *Id.* The next day, Belcan's HR Director reported that she and another Belcan manager "spoke with Mahesh this afternoon. He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors." *Id.* Two weeks later, one of the individuals who was included on these email threads sent an email to the Belcan HR Director, the General Manager, and the Vice President of Human Resources. The sole content of the email was a link to a website that described a class action antitrust lawsuit concerning a "conspiracy" between companies who had agreed to "restrict[] recruiting of each other's employees." *Id.* ¶ 38.

### 5.     P&W AND QUEST CONSPIRED TO RESTRICT P&W'S HIRING OF QUEST-EMPLOYED ENGINEERS.

93.     As part of and to effectuate the No-Poach Agreement, P&W and QuEST agreed to restrict P&W's hiring and recruiting of Engineers from QuEST. P&W and QuEST did so through two primary means: 1) setting a two-year tenure restriction for any QuEST Engineers hired by P&W, and 2) instituting periodic hiring freezes, in which P&W would not make any hires of QuEST Engineers.

### a.    THE TWO-YEAR TENURE RESTRICTION

94.    In 2011, Robert Harvey, a QuEST executive – who has served as Senior Vice President, President-Strategic Accounts, and President-Global Business Head during his time at QuEST – began pushing Patel to enter an agreement in which P&W would wait to hire QuEST's employees until they had worked at QuEST for a specified length of time. Patel Affidavit ¶ 41; DOJ Indictment ¶ 24.

95.    In September of that year, Harvey, along with another QuEST employee, attended a dinner with Patel and a P&W Vice President to whom Patel directly reported. The objectives of the dinner included a discussion of the QuEST executive's proposal. Patel Affidavit ¶ 42; DOJ Indictment ¶ 24(a).

96.    The day following that dinner, the QuEST executive sent an email to the attendees, stating: "We truly appreciate and value our strategic relationship. . . . I thought I would take the lead in summarizing what we discussed last night and proposed next steps . . ." Patel Affidavit ¶ 42. The first item on the list was "Personnel Transfers" (in quotations in the original email). *Id.* Harvey described this as "the new policy/guidelines" that the P&W Vice President had reviewed at the dinner, which set a "min. 24 months" period for such "Personnel Transfers." *Id.* Harvey further indicated that Patel had advised that he limit the written record on this agreement, noting that, "[f]ollowing Mahesh's previous counsel, [he would] not go[] into detail in writing on this subject." *Id.*

97.    Subsequently, starting in late 2011, managers and executives from QuEST would routinely communicate with Patel and others in his outsourcing management group at P&W concerning this agreement. *Id.* ¶ 43. Specifically, these managers and executives worked to reconfirm, maintain, and enforce this agreement and to block or attempt to block P&W's recruiting and hiring of those QuEST employees covered by the agreement. *Id.*

98.    For example, in October 2012, one QuEST employee wrote to Patel concerning an employee about whom Patel had inquired, stating: "[Employee's] tenure at [QuEST] dates to May 2011. Based on our agreement of two year minimum tenure, we would ask that [P&W] not pursue employment of [him] at this time." *Id.* ¶ 44.

99.    Similarly, in June 2015, Patel emailed managers from QuEST (including Harpreet Wasan), stating that P&W "is interested in interviewing and hiring" two QuEST Engineers and asking that QuEST "[p]lease provide your concurrence." *Id.* ¶ 45. One of the QuEST managers responded that, while one of the Engineers had worked at QuEST for four and a half years and "meets requirements," the other "only has 8 months and does not meet obligation, so [QuEST] cannot provide concurrence." *Id.*

100.    As another example, in April 2017, two QuEST managers, discussing a P&W request to hire a certain QuEST Engineer, noted in an internal email that this employee "wouldn't meet our requirements for two years." Patel Affidavit ¶ 46; DOJ Indictment ¶ 24(b). Two days later, one of these managers emailed Patel to inform him that the employee "does not meet tenure requirements." *Id.* Patel in turn told a P&W HR employee: QuEST "Will not release him . . . He has not completed 2 [y]ears as our verbal agreements." *Id.*

### b.    HIRING FREEZES

101.    In furtherance of the conspiracy, representatives of QuEST and Patel also agreed upon periodic freezes of P&W's recruiting and hiring of any QuEST employees, with limited exceptions.

102.    These hiring freezes took place from approximately 2015 through 2017 and ranged from several months to nearly an entire year in 2016. Each began when QuEST managers and executives petitioned Patel to limit or stop hiring from QuEST.

103.    For example, in September 2015, following a request by Patel for QuEST's "concurrence" in P&W's hiring of two QuEST Engineers, Harpreet Wasan (one of the QuEST executives Patel had emailed) responded with a lengthy complaint concerning the frequency of P&W's hiring of Engineers from QuEST. The QuEST executive noted that, while both of the employees in question "have at least two years [QuEST] experience, so [they] meet the 'handshake agreement' level," he stated: "[QuEST] will not be able to concur with any more hiring of [QuEST] employees this year. . . . All we can do is highlight the problem and ask that [P&W] support us going forward to prevent further hiring of our resources." Patel Affidavit ¶ 48. Robert Harvey, another QuEST executive copied on Patel's request, responded to this email and added, addressing Patel directly, "Mahesh, we truly need your help in blocking these two hires and putting a moratorium on [QuEST] hires for the remainder of the year." *Id.*

104.    In a further example, in January 2016, Harpreet Wasan, QuEST's Vice President/Strategic Client Partner, reported to its Chief Engineer/Account Manager and another colleague that, "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. Also I am going to tell him that he needs to block" two QuEST Engineers "from being hired until we come to an agreement on the acceptable limit to hire [from] our team." Patel Affidavit ¶ 49; DOJ Indictment ¶ 23(a). On information and belief, this meeting led to Patel and the QuEST executives establishing a new hiring freeze for 2016.

105.    After reaching agreement with QuEST executives, Patel would announce the beginning of hiring freezes to P&W personnel involved in recruiting and hiring Engineers for P&W and instruct that these freezes be respected. As an example, in September 2017, Patel emailed the Vice President of HR-Engineering for P&W and requested that she "direct your HR team not to hire [QuEST] outsource resources currently deployed on [P&W] projects till end of

this year. . . . [QuEST] senior leadership including CEO has repeatedly raised concerns on [P&W] hiring [QuEST] employees. We will lift [QuEST] hiring restriction from Jan 1, 2018." Patel Affidavit ¶ 50; DOJ Indictment ¶ 25(a).

### c.    P&W AND QUEST SHARED A FINANCIAL INTEREST IN SUPPRESSING LABOR COSTS

106.    The agreement between P&W and QuEST to limit recruiting and hiring of QuEST Engineers by P&W served both of their financial interests by alleviating upward pressure on labor costs to both companies. Specifically, by agreeing to restrict P&W's recruiting and hiring from QuEST, QuEST was able to keep its labor costs down and likewise maintain the low prices that it offered to P&W for its outsourcing projects. Were QuEST to contend with the higher wages and recruiting for Engineers offered by P&W absent the agreement, QuEST would face increased pressure to compete with P&W on wages, benefits, and professional opportunities and an ensuing need to hike prices for its P&W projects.

107.    Representatives from QuEST explicitly called out the shared benefits to the limitations on recruiting and hiring in their efforts to push P&W to agree to hiring freezes. Specifically, QuEST appealed to the financial benefits that would accrue to both QuEST and P&W if P&W ceased recruiting and hiring QuEST Engineers, including by resisting wage increases.

108.    For example, in June 2017, Robert Harvey, QuEST's President, forwarded a business proposal to P&W and noted that this proposal provided "a partnership approach on how we can minimize bill rate increases necessary to hire and retain resources needed to provide the desired services to" Raytheon, P&W's parent company. Patel Affidavit ¶ 52. The attached presentation explicitly promoted and proposed further hiring restrictions for P&W of QuEST Engineers, noting that "[w]e have found that customer hiring of our resources puts pressure on

[QuEST's] and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time." Patel Affidavit ¶ 52; DOJ Indictment ¶ 27(d).

6.    USE OF MISLEADING INFORMATION REGARDING EMPLOYEES' ABILITIES TO SWITCH EMPLOYERS BY QUEST AND DEFENDANTS

109.    QuEST reinforced and enhanced the effects of the No-Poach Agreement by lying to Engineers QuEST employed "by communicating that employment at other co-conspirator companies was unavailable to them because of noncompete agreements rather than the conspiratorial agreement." DOJ Indictment ¶ 29(d).

110.    QuEST and other Supplier Defendants often represented to their employees that they could not leave for competitor Supplier Defendants due to the terms of non-compete agreements in their employment agreements when, in reality, QuEST and Supplier Defendants were simply attempting to accomplish the goals of the No-Poach Agreement.

111.    QuEST and other Supplier Defendants would, upon learning that an employee was leaving for a competitor Supplier Defendant, threaten the Engineer with misleading information regarding the terms of non-compete agreements, their enforceability, and the reasons for QuEST and Supplier Defendants' objections to the move.

112.    This aggressive use, or threatened use of a purported non-compete agreement helped accomplish the goals of the No-Poach Agreement by providing another mechanism to restrict Engineers' freedom of movement within the labor market.

### G.    ANTICOMPETITIVE EFFECTS AND INJURIES TO CLASS MEMBERS CAUSED BY DEFENDANTS' CONSPIRACY

113.    The No-Poach Agreement challenged herein has impaired Engineers' mobility and suppressed their compensation below competitive levels.

114.    This anticompetitive agreement to impair Engineers' mobility and suppress their compensation included restrictions on recruiting and hiring among the Supplier Defendants and P&W. This has had significant anticompetitive effects with no countervailing procompetitive benefits.

115.    The No-Poach Agreement suppressed wages for Engineers by restricting the availability of attractive outside opportunities for Supplier Defendants' Engineers. In a competitive market, the threat of losing employees to a competitor would encourage Supplier Defendants to raise wages – either preemptively, in response to direct offers from rival employers, or as a reactive response to retain employees (whether specific or general) – in order to increase morale and competitive positioning and ultimately to retain valuable labor. Such competition is absent due to the No-Poach Agreement.

116.    The positive compensation effects of hiring Engineers from competitors are not limited to the particular individuals who seek new employment or to the particular individuals who would have pursued new positions but for the No-Poach Agreement. Instead, the effects of a "no-poach" restraint in the labor market (and, in particular the effects of suppressing recruiting and hiring pursuant to the No-Poach Agreement here) commonly impact all individuals in positions subject to the restraint.

117.    In accord with economic theory and the above allegations, the No-Poach Agreement here artificially reduced the compensation of all Engineers below levels that would have prevailed in its absence.

29

118.    Plaintiffs and all other members of the proposed Class were harmed by the No-Poach Agreement alleged herein. Defendants' unlawful No-Poach Agreements restrained competition in the market for aerospace engineering services, which had the (intended) effect of suppressing compensation and mobility for all members of the proposed Class. Thus, Plaintiffs and the members of the proposed Class suffered antitrust injury.

119.    Without this class action, Plaintiffs and the proposed Class will remain unable to receive compensation for the harm they suffered, and Defendants will continue to reap the benefits of their illegal conspiracy.

120.    The unlawful No-Poach Agreement entered into by Defendants is a *per se* illegal restraint on competition entered into by horizontal competitors in the market for aerospace engineering services.

121.    In the alternative, Defendants are liable under a "quick look" analysis where someone with even a rudimentary understanding of economics could conclude that the arrangement and No-Poach Agreement alleged would have an anticompetitive effect on proposed Class members and markets.

122.    In the alternative, Defendants are liable under a Rule of Reason analysis because their No-Poach Agreement reduced compensation and restrained mobility and competition in the market for Engineers' services. The unlawful No-Poach Agreement between Defendants had no procompetitive effects and was not intended to have procompetitive effects. In fact, the No-Poach Agreement had the explicit intent to suppress compensation to Engineers and was successful in effectuating that intent. The No-Poach Agreement had additional anticompetitive effects, including, *inter alia*, eliminating competition for skilled labor, preventing Plaintiffs and members of the proposed Class from obtaining employment and earning compensation in a competitive

market, and preventing or limiting employment opportunities and choice with respect to such opportunities. Such anticompetitive effects outweigh any conceivable procompetitive benefits of the conspiracy.

123.    Because Defendants employed members of the proposed Class in Vermont, Massachusetts, Illinois, Ohio, Georgia, Florida, Puerto Rico, Kentucky, and throughout the United States, including in this District (Connecticut). The No-Poach Agreement has substantially affected interstate commerce and has caused antitrust injury throughout the United States.

### H.    DEFENDANTS CONCEALED THE NO-POACH AGREEMENT

124.    Defendants actively and fraudulently concealed their illegal No-Poach Agreement from the public and the proposed Class. Defendants did not disclose the existence of the No-Poach Agreement to their Engineers or to the public. As further alleged above, however, Defendants would monitor and enforce each other's compliance with the No-Poach Agreement.

125.    The nature of the No-Poach Agreement ensures it would remain largely undetected by Engineers and the public. Defendants entered into the No-Poach Agreement orally (the existence of which various emails confirm), affirmatively avoiding memorializing the No-Poach Agreement in a written agreement despite its broad application and multi-year duration, opting instead to inform new executives about the No-Poach Agreement's existence on a primarily oral basis. The reason for this practice was to avoid alerting the public and the proposed Class of the No-Poach Agreement's existence and, thus, to deter potential investigations, litigation, and to perpetuate the Agreement's illegal effects.

126.    Indeed, the federal investigator from the Defense Criminal Investigative Service (DCIS) of the United States Department of Defense, Office of the Inspector General that wrote the Patel Affidavit found that, although some individuals heard rumors of the agreement, likely from the select few direct victim-witnesses who were denied positions due to the conduct, in many

instances even victim-witnesses were unaware of the actions taken by Defendants to block their job applications. Patel Affidavit ¶ 54. Moreover, the far-reaching impact of the restrictions on recruiting and hiring, which extends to those Engineers who had not directly applied for employment with another Defendant, ensures that the vast majority of the proposed Class, including Plaintiff, were unaware of the No-Poach Agreement because of Defendants' active concealment of the agreement. As for those members of the proposed Class whose compensation was directly affected by the conduct without such members actively searching for a new position with a Defendant, the No-Poach Agreement was undiscoverable through any reasonable inquiry.

127.     Defendants' acts of concealment resulted in the No-Poach Agreement remaining secret until the DOJ filed its partially unsealed criminal complaint and arrest warrant for Mahesh Patel on December 9, 2021. Only then did it become public that Defendants were engaged in an illegal conspiracy to suppress Engineers' wages by restraining recruitment and hiring of one another's Engineers. Further, the secrecy of the No-Poach Agreement and Defendants' acts of concealment would have thwarted any reasonable effort to discover the No-Poach Agreement before that date.

## V.     CLASS ACTION ALLEGATIONS

128.     Plaintiffs bring this action individually and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as:

> All natural persons who worked at one or more of the Defendants as Engineers from January 2011 through such time as Defendants' anticompetitive conduct ceased (the "Class Period").

129.     Excluded from the Class are members of Defendants' boards of directors, Defendants' senior executives who entered into and/or enforced the No-Poach Agreement, and any and all judges assigned to hear or adjudicate any aspect of this litigation and their judicial staff.

130.    Plaintiffs do not yet know the exact size of the proposed Class because such information is in the exclusive control of Defendants. Based upon publicly available information, there are thousands of Class members. Joinder of all members of the Class is therefore impracticable.

131.    Class members are easily ascertainable based on, among other things, the employment records of Defendants.

132.    There are many questions of law and fact common to the Class as a whole, including:

> (a)    Whether, when, and how Defendants entered into, operated, monitored, and enforced the No-Poach Agreement;
>
> (b)    Whether Defendants concealed the existence of the No-Poach Agreement from Plaintiffs and the members of the Class;
>
> (c)    Whether Defendants' conduct violated Section 1 of the Sherman Act;
>
> (d)    Whether the No-Poach Agreement is a *per se* violation of the Sherman Act;
>
> (e)    Whether the No-Poach Agreement restrained trade, commerce, or competition for Engineers between Defendants;
>
> (f)    Whether Plaintiffs and the Class have suffered antitrust injury;
>
> (g)    Whether Defendants undertook actions to conceal their unlawful No-Poach Agreement; and
>
> (h)    The appropriate measure of damages.

133.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

134.    Plaintiff's claims are typical of the claims of the Class.

135.    Plaintiffs will fairly and adequately represent the interests of, and has no conflicts of interest with, the Class.

136.    Plaintiffs have retained counsel experienced in antitrust and class action litigation

to represent themselves and the Class.

137.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications and be inefficient and burdensome to the parties and the Court.

## VI.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**(Violation of the Sherman Act, 15 U.S.C. § 1, *et seq.*)**

138.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

139.    Defendants entered into a combination and conspiracy in an unreasonable and unlawful restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

140.    The No-Poach Agreement is a *per se* violation of Section 1 of the Sherman Act.

141.    Defendants collectively possess monopsony power in the relevant market. Through their No-Poach Agreement, Defendants harmed competition in the relevant market

142.    The combination and conspiracy consisted of a continuing agreement, understanding and concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants agreed to restrain competition in the aerospace engineering market.

143.    Defendants' acts as part of, and in furtherance of, their agreement, understanding, contract, combination, or conspiracy were authorized, ordered, or done by their respective senior executives while actively engaged in the management of Defendants' affairs.

144.    Defendants' unlawful combination, conspiracy, and agreement had the following effects, among others:

        a.   Competition between Defendants for Engineers was suppressed, restrained, or eliminated; and

        b.   Plaintiffs and members of the Class received lower compensation from Defendants than they otherwise would have received in the absence of the No-Poach Agreement and, as a result, were injured and suffered damages in an amount according to proof at trial.

145.    Defendants' No-Poach Agreement had no procompetitive benefits or justifications. The No-Poach Agreement provided no efficiencies or other benefits that would offset the substantial competitive harms described above.

146.    As a direct and proximate result of Defendants' illegal No-Poach Agreement, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition for their labor on the merits.

147.    Plaintiffs and members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct, and a declaration that such agreement is unlawful.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment on his behalf and that of the Class by adjudging and decreeing that:

A.    This action may be maintained as a class action, with Plaintiffs as the designated Class representative and Plaintiffs' counsel as Class counsel;

B.    Defendants engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and that Plaintiffs and the members of the Class have been damaged and injured in their business as a result of this violation;

C.      The alleged conduct be adjudged and decreed to be a *per se* violation of Section 1

of the Sherman Act, 15 U.S.C. § 1, or in the alternative, a violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1, under the quick look or rule of reason frameworks;

D.      Plaintiffs and the members of the Class recover threefold the damages determined

to have been sustained by them as a result of the conduct of Defendants complained of herein and

that judgment be entered against Defendants for the amount so determined;

E.      Judgment be entered against Defendants in favor of Plaintiffs and each member of

the Class, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as

determined to have been sustained by them;

F.      For prejudgment and post-judgment interest;

G.      For equitable relief, including a judicial determination of the rights and

responsibilities of the parties;

H.      For attorneys' fees;

I.      For costs of suit; and

J.      For such other and further relief as the Court may deem just and proper.

## VIII.  JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all

claims and issues so triable.

DATED:      January 17, 2022            /s/ *David S. Golub*
                                        David S. Golub ct00145
                                        Jonathan M. Levine ct07584
                                        Steven L. Bloch (*pro hac vice* forthcoming)
                                        Ian W. Sloss (*pro hac vice* forthcoming)
                                        **SILVER GOLUB & TEITELL LLP**
                                        One Landmark Square – 15th Floor
                                        Stamford, CT 06901
                                        Phone: (203) 325-4491
                                        Fax: (203) 325-3769
                                        dgolub@sgtlaw.com

jlevine@sgtlaw.com
sbloch@sgtlaw.com
isloss@sgtlaw.com

*Attorneys for Plaintiff*